PATRICIA RIVET MURRAY, Judge.
| [The plaintiff, Patricia Orgeron, appeals the trial court’s judgment finding the defendants, Dr. Kelvin Contreary and his malpractice insurer, Louisiana Medical Mutual Insurance Company, not liable for the death of plaintiffs sister. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
The plaintiffs sister, Nelmar Hainley, was examined by Dr. Contreary, a general surgeon, on May 11, 2000. Ms. Hainley complained to Dr. Contreary of abdominal pain for which her internist, Dr. Paul Ver-rette, had been unable to determine the cause.[1] Upon examination, Dr. Contreary noted tenderness in the left lower quadrant of Ms. Hainley’s abdomen and felt something which he alternately described as a thickening or a mass. Suspecting that Ms. Hainley had a ventral hernia, Dr. Contreary ordered a CT scan and a barium enema. Neither test indicated the presence of a hernia. Still believing Ms. Hainley had a hernia or ^possibly scar tissue that was causing her pain, Dr. Con-treary scheduled her for exploratory abdominal surgery.
On June 7, 2000, Dr. Contreary performed a 26-minute laparoscopic surgery on Ms. Hainley at Chalmette Medical Center. Dr. Contrary did not find a hernia, but he did find intestinal tract adhesions, which he lysed.[2] Ms. Hainley initially recovered well from the surgery and was released the next day, June 8. However, in the early morning hours of June 19, Ms. Hainley came to the emergency room of *579 Chalmette Medical Center complaining of severe abdominal pain, fever and a greenish discharge from her incision. Dr. Con-treary determined that Ms. Hainley had developed a wound dehiscence, or splitting open of her incision. He immediately took her into surgery to repair the damage.
Following the June 19 surgery, Dr. Con-treary put Ms. Hainley on antibiotics and consulted an infectious disease specialist to assist in her hospital treatment. However, Ms. Hainley developed further complications that ultimately resulted in her death on October 26, 2000.
Ms. Orgeron, who is sole surviving relative, timely filed a medical malpractice complaint against Dr. Contreary alleging that his treatment of Ms. Hainley fell beneath the standard of care. Pursuant to La. R.S. 40:1299.47, the complaint was submitted to a medical review panel, which unanimously concluded that Dr. Contreary had breached the standard of care resulting in the complainant’s ^damages. The reason given by the panel was “a lack of documentation in the record to support the indications for the June 7 operation.”
On May 12, 2003, the plaintiff filed the instant action against Dr. Contreary and his professional liability insurer alleging that Dr. Contreary’s decision to perform the June 7 surgery was inappropriate and fell beneath the applicable standard of care, causing Ms. Hainley further pain and suffering, medical expenses and ultimately her death. A bench trial was held in the district court on January 23-25, 2007. Fact witnesses included the plaintiff, her husband and her son. Expert witnesses testifying for the plaintiff included Dr. James Balliro and Dr. Ronald Nichols.[3] Besides Dr. Contreary himself and Dr. Yerrette (Ms. Hainley’s internist), all three members of the medical review panel, namely, Dr. James Dowling, Dr. Thomas Brown, and Dr. Julius Levy, gave expert testimony in favor of the defendants, each having changed his opinion since the rendering of the panel’s decision.
The trial court took the case under advisement and issued a written judgment on April 18, 2007, holding that Dr. Contreary did not violate the standard of care, and dismissing all the plaintiffs claims. In written reasons for judgment, the trial court noted that she had particularly relied upon the testimony of Dr. Contreary and of Dr. Julius Levy. The plaintiff timely filed a motion for new trial, which was denied May 22, 2007. This appeal followed.
IJSSUES
The plaintiff essentially raises two issues on appeal:
(1) The trial court committed manifest error by ruling in favor of the defendants because:
(a) The trial court erroneously relied upon Dr. Contreary’s testimony, which was inconsistent;
(b) The trial court erroneously chose to believe Dr. Levy, whose testimony was contradictory;
(c) The trial court mischaracterized and ignored Dr. Balliro’s testimony;
(d) The trial court disregarded the medical review panel’s opinion; and
(e) The trial court in its reasons for judgment misquoted and distorted the testimony of the plaintiff;
(2) The trial court’s misquoting in its reasons for judgment of the language in the surgical consent form signed by *580 Ms. Hainley warrants reversal of the judgment.
APPLICABLE LAW
In a medical malpractice action, the plaintiff must prove three elements: (1) the degree of knowledge or skill required by doctors in the same field in a similar locale; (2) that the defendant physician lacked or failed to utilize that standard of care; and (3) that the defendant’s conduct was the proximate cause of the plaintiffs injury. See La. R.S. 9:2794; Serigne v. Ivker, 00-0758, 0759, pp. 4-5 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787. Determinations of the requisite level of skill required, whether the standard of care has been breached and whether causation exists are findings of fact, which can be reversed only upon a finding of manifest error. Id. (citing Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991)). Therefore, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Arceneaux v.Domingue, 365 So.2d 1330, 1333 (La.1978).
When the trial court’s findings are based upon the credibility of witnesses, the manifest error standard requires that the appellate court give great deference to the trial court because only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily upon the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). Nevertheless, the reviewing court may find manifest error in a credibility determination if the witness’s testimony is so internally inconsistent or implausible on its face, or is so contradicted by documents or other objective evidence, that a reasonable fact finder would not credit it. However, where such factors are absent, and the trial court’s finding is based upon a decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844-45 (citations omitted).
| ^Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions. Martin v. East Jefferson General Hospital, supra, at 1277. Determinations of the credibility of expert witnesses are subject to the same manifestly erroneous/clearly wrong standard of review as are credibility determinations concerning fact witnesses. Id.
DISCUSSION
Issue Number One
The appellant’s primary argument is that the trial court’s credibility determinations, particularly with regard to the testimony of Dr. Contreary, Dr. Balliro, Dr. Levy and Ms. Orgeron herself, as well as the court’s disregard of the medical review panel opinion, are so unreasonable in light of the entire record that they warrant reversal under the manifest error standard. We disagree.

Dr. Contreary

The defendant, Dr. Contreary, who was qualified as an expert in general surgery, testified on direct, cross and i'e-cross examinations, and his discovery deposition was introduced into evidence. He stated that when Ms. Hainley, then sixty-two years old, came to see him on May 11, 2000, he was “very familiar” with her medical history because he had done several prior surgeries on her, including two to repair recurrent hernias, and his profes *581 sional relationship with her dated back to the early 1990’s. However, he had not seen Ms. Hainley in his office for 17several years. He knew Ms. Hainley was overweight'[4] and was a smoker; that she suffered from COPD[5], peripheral vascular disease, hypertension and depression; that she had undergone previous abdominal surgeries; and that she had the tendency to be overly dependent upon prescription medication. In addition, Dr. Contreary testified he knew Dr. Verrette, Ms. Hain-ley’s primary care doctor, well and saw him nearly every day, as he and Dr. Ver-rette were both on staff at Chalmette Medical Center, and they often discussed patients they had in common.
According to Dr. Contreary, Ms. Hain-ley indicated to him during her May 11 office visit that Dr. Verrette had suggested the visit because he had been unable to alleviate her abdominal pain, which she said had been going on “for awhile.” She indicated that she had sought out Dr. Con-treary because her pain was persisting and it was not getting any better. When he examined her, he felt a “thickening” in her abdomen which, coupled with the tenderness she had in that area, could possibly be a hernia or could be scar tissue. Although he could not definitely tell whether she had a hernia, given her history of prior hernias he believed she probably did have one. His diagnostic impression was abdominal pain of uncertain etiology, a possible ventral hernia and probable adhesions. Dr. Contreary identified his office notes from that visit, which indicated the patient had a “tender left lateral abdominal wall over palpable hernia.” He also identified a consult note written to Dr. Verrette, which stated “Tender left lower quadrant at inci-sional hernia. Chronic abdominal pain. Recommend CT of abdomen, pelvis, LBarium enema. Question surgical exploration?” Dr. Contreary testified he did not have any further written communication with Dr. Verrette prior to the June 7 surgery, but he felt certain that he had talked to Dr. Verrette sometime prior to the surgery; he could not recall, however, whether his conversation with Dr. Verrette had occurred before or after Ms. Hainley underwent the CT scan and barium enema.
The results of the CT scan and barium enema did not indicate the presence of a hernia. Still believing Ms. Contreary probably had a hernia, Dr. Hainley scheduled her for exploratory abdominal surgery to determine the cause of her pain. Dr. Contreary testified that he spoke by telephone to Ms. Hainley prior to scheduling the surgery, and that she understood the purpose of the surgery and further understood that he did not have a definite explanation for her abdominal pain. He did not record any notes of his conversation with Ms. Hainley, however.
Dr. Contreary acknowledged that on the admission note or “short stay form” in the hospital’s records, he wrote “ventral hernia” rather than “possible ventral hernia” as the indication for the surgery. He also identified the surgical consent form signed by Ms. Hainley, which read “Open abdomen to fix hernia and remove scar tissue if possible.” When asked why there was no mention of adhesions, he indicated that scar tissue and adhesions are the same, explaining that “scar tissue” is “layman’s speak” for adhesions.
Dr. Contreary testified that, despite knowing Ms. Hainley’s various health problems, he did not believe she was a poor surgical candidate. He specifically *582 1 flnoted that prior to the June 7 surgery (within a year or so), Ms. Hainley had undergone a complete cardiac workup, which had been perfectly normal, and that she had not been a poor healer in her past surgeries. Although he knew Ms. Hainley had demonstrated an “affinity for narcotics” in the past, he noted that during her May 11 visit, she had not asked him for any pain medication.
Dr. Contreary testified that, during the June 7 surgery, he did not find a hernia but did find thickened scar tissue around a large cicatrix scar and intestinal tract adhesions, which he lysed. Although he did not see anything that he could identify as the definitive cause for her pain, he hoped that by lysing all the adhesions, he had taken care of the offending ones. He discharged Ms. Hainley from the hospital on June 8. He further testified that her abdomen appeared to be “fine” at her June 14 post-operative visit, and he removed her staples. However, five days later she was admitted to the emergency room with a complication known as a “dehiscence.” He explained that her sutures had pulled through her abdominal wall, but the sutures themselves had not broken, creating a bowstring effect across the gap in her abdomen caused by her muscles having pulled apart. Then, whenever she moved or coughed, her intestines were being pushed up against the strings, which eventually spliced through parts of her small bowel and colon. Dr. Contreary performed surgery the same day to repair the damage. He cut out the sutures, irrigated the wound, repaired the bowel and colon, and rebuilt the torn section of the abdominal wall with polypropylene mesh.
| ¡ nHowever, Ms. Hainley developed further complications after the June 19 surgery, including a fistula[6] that did not close and caused an infection in the mesh. She eventually developed sepsis, and, despite undergoing further surgeries including a hemicolectomy, she never got well enough to go home. For 131 days, she was transferred back and forth between the hospital and a long term care facility until her death on October 26, 2000.
The plaintiff contends that Dr. Con-treary’s testimony is full of inconsistencies and is contradicted by documentary evidence, specifically his own office notes, the hospital records, and his position paper to the medical review panel. Plaintiff argues that these inconsistencies make it impossible for a reasonable fact finder to have credited Dr. Contreary’s testimony. We do not find this contention to be supported by the record.
For instance, the plaintiff argues that the testimony is inconsistent because in his deposition Dr. Contreary said he did not “feel a hernia” when he examined Ms. Hainley, but at trial he said he felt a thickening, which he later testified was a “palpable mass,” but which his office notes describe as a “palpable hernia.” Nevertheless, when each of these statements is viewed in context, and the testimony is considered in its entirety, Dr. Contreary consistently expressed that he felt something in Ms. Hainley’s abdomen, but he could not be absolutely sure that what he felt was a hernia; he also readily admits that he did not clearly document |nthis uncertainty, but rather noted what he believed she probably had: a ventral hernia.
Plaintiff also claims Dr. Contreary’s testimony regarding his communication with Dr. Verrette, Ms. Hainley’s treating physician, is inconsistent. Dr. Contreary admit *583 ted that he could not remember exactly when he spoke to Dr. Verrette, but he believed he had discussed Ms. Hainley with Dr. Verrette prior to performing the June 7 surgery because he saw Dr. Ver-rette nearly every day at the hospital and usually discussed patients with him during rounds and at lunch. However, he also testified that he did not believe he needed Dr. Verrette’s approval to do the surgery.
Despite plaintiffs argument, however, the evidence supports Dr. Contreary’s testimony. He obviously believed Dr. Ver-rette had sent Ms. Hainley to see him because he wrote a consult note to Dr. Verrette at the conclusion of the May 11 office visit. In addition, Dr. Verrette testified that he remembered discussing Ms. Hainley’s situation with her and with Dr. Contreary “on more than one occasion pri- or to the surgery and after.” Dr. Verrette further stated that he remembered “expressing to Dr. Contreary that he (Dr. Verrette) had reached a point in Ms. Hain-ley’s treatment at which he was not sure what to do and he wanted Dr. Contreary’s input.” According to Dr. Verrette, although he was concerned that Ms. Hainley could have been exaggerating her pain, he had also become worried “that it was getting risky to do nothing.” It was also Dr. Verrette’s opinion that Ms. Hainley was medically ready for surgery, and that an exploratory 11g“lap” “could be done quickly enough for her to keep her medical problems stable while she went through it.”
Plaintiff also points out that Dr. Con-treary’s testimony that Ms. Hainley was referred to him by Dr. Verrette conflicts with the position paper submitted by Dr. Contreary to the medical review panel, in which he indicated that Ms. Hainley had come to him on her own seeking out surgery against the wishes of Dr. Verrette. At trial, Dr. Contreary explained this discrepancy by noting that the position paper was written by his lawyers rather than by him. He further testified that the position paper focused on the specific complaint made to the medical review panel, which was that Dr. Contreary violated the standard of care in his treatment of Ms. Hain-ley after the surgery (from June 18 through October 26, 2000). Because the original complaint focused on his treatment of Ms. Hainley for the complications she developed about ten days after the June 7 surgery, his position paper did not address his decision to recommend the surgery.
Plaintiffs final arguments regarding Dr. Contreary’s credibility involve discrepancies between his testimony and his own written records. However, Dr. Contreary admitted that his documentation was not precise. He indicated that his notes were written for his own benefit. He acknowledged that on May 11, he did not take a formal history from Ms. Hainley as is his usual practice because he was familiar with her history. He also admitted that in his notes and on certain hospital forms he indicated the surgery was for a hernia rather than writing “possible hernia.” He also did not record that Ms. Hainley was experiencing abdominal | 13pain, although he testified the primary reason for the surgery was to determine the cause of her pain. He pointed out that in his office notes he used the word “tenderness,” which to him is equivalent to pain.
In light of all the evidence, we do not find Dr. Contreary’s explanations or his testimony as a whole to be so inconsistent or contradicted that it was unreasonable for the trial court to have believed him. We therefore reject plaintiffs arguments in this respect.

Dr. Levy

Dr. Levy, who was qualified as an expert in general surgery, was a member of the medical review panel that unani *584 mously found Dr. Contreary had breached the standard of care. Although all three members of the panel changed their minds and testified at trial that they did not believe Dr. Conteary had committed malpractice, the trial court found only Dr. Levy to be persuasive. Plaintiff argues it was manifest error for the trial court to have believed Dr. Levy because his testimony was contradictory, and because he gave no rational basis for having changed his mind.
Dr. Levy testified that the opinion of the medical review panel was solely based upon the lack of documentation of the indications for the June 7 surgery. He testified that if any of the written records had shown that Ms. Hainley was suffering from chronic abdominal pain, he would have considered that a sufficient indication for the surgery. He testified that he was later presented with two items of evidence, Dr. Contreary’s deposition and an affidavit of Dr. Verrette, neither of | nwhich existed at the time the panel rendered its decision. Because these items of evidence indicated that Ms. Hainley had persistent abdominal pain that had been unresponsive to treatment, Dr. Levy changed his mind about Dr. Conteary’s decision to perform surgery. Dr. Levy testified that Ms. Hainley’s abdominal pain was a sufficient indication for the exploratory surgery performed by Dr. Contreary.
Plaintiff argues that this explanation is not credible, especially because Dr. Levy’s testimony contains inconsistencies regarding what constitutes “chronic” pain and whether adhesions and/or a palpable mass would also be sufficient indications for exploratory surgery. Nevertheless, we cannot say that Dr. Levy’s explanation of why he changed his opinion, or his testimony as a whole, was so unreasonable that no reasonable fact finder could have believed him. The fact that Ms. Hainley was experiencing abdominal pain for at least several months prior to the surgery is reflected not only in Dr. Contreary’s deposition, but also in Dr. Verrette’s office records and testimony as well as in the testimony of Ms. Hainley’s sister and brother-in-law, with whom Ms. Hainley was living at the time. Moreover, Dr. Verrette in his affidavit expressed his opinion “That the appropriate evaluation and intervention in this case was determined by Dr. Con-treary.” [7] Considering this evidence, we do not find the trial court’s reliance upon Dr. Levy’s testimony to be manifest error.
|1S Dr. Balliro
The plaintiff argues that the trial court mischaracterized and overlooked the testimony of Dr. Balliro, who was qualified as an expert in general surgery. Dr. Balliro testified that he had reviewed the medical records; the deposition testimony of Drs. Contreary, Levy and Brown, the medical review panel submissions; and the affidavit of Dr. Verrette; in addition, he had been present in the courtroom for the direct testimony of Dr. Contreary. Based on this evidence, Dr. Balliro opined that the June 7 operation on Ms. Hainley was ill conceived and contraindicated.[8] He based this opinion upon several factors. First, he opined that because of Ms. Hain-ley’s pre-existing medical conditions, she was a poor candidate for major abdominal surgery and had an increased risk of de *585 veloping a wound dehiscence. He next opined that, based upon his review of Dr. Verrette’s and Dr. Contreary’s office records, Dr. Contreary had no basis for concluding that Ms. Hainley was having chronic abdominal pain (which was reflected in Dr. Contreary’s consult note to Dr. Verrette). He further stated that Dr. Contreary had an obligation to contact Dr. Verrette, but nothing in the records showed that he had done so. Moreover, in his opinion the possibility that Ms. Hainley had a ventral hernia was ruled out by the CT scan results and the fact that Dr. Contreary could not feel a hernia. Finally, he opined that suspicion of adhesions is not a sufficient indication for abdominal surgery. Dr. Balliro concluded that, given the circumstances, Dr. | tr,Contreary’s decision to recommend surgery to Ms. Hainley was a breach of the applicable standard of care.
In its reasons for judgment, the trial court stated that Dr. Balliro’s opinion, as well as the opinion of the medical review panel at the time they rendered their decision, “rested almost squarely upon the absence of any documentation of the presence of a hernia and/or abdominal pain significant enough to warrant his surgery.” Plaintiff contends that this statement is a mischaracterization of Dr. Balliro’s testimony. According to plaintiff, the crux of Dr. Balliro’s opinion was that the standard of care does not permit surgery based solely on complaints of pain unaccompanied by clinical findings. Therefore, plaintiff argues, it was manifest error for the trial court to ignore Dr. Balliro’s testimony and instead, to focus upon whether or not Ms. Hainley was in sufficient pain to warrant exploratory surgery.
We reject this argument. Dr. Balliro was not the only expert who testified. Even assuming the trial court found him to be credible,[9] the court heard five other medical experts, one of whom was Ms. Hainley’s primary care doctor and the other four of whom were surgeons. Every opinion rendered by Dr. Balliro was controverted by one or more of the other medical experts. For example, the other four surgeons all testified that abdominal pain alone can be an indication for surgery, although they differed as to the extent and/or severity of the pain required. Because of their views, it was reasonable for the trial court to make a | ^determination as to whether Ms. Hainley was experiencing sufficient pain to warrant surgery. Moreover, all the medical experts except Dr. Balliro testified at trial that Dr. Con-treary’s decision to recommend surgery was not a violation of the standard of care. The trial court’s choice to accept the opinion of one expert over another, when there are multiple views that are consistent with the evidence, is not manifest error. We therefore decline to disturb the trial court’s findings in this regard.

The Medical Review Panel

Plaintiff contends the trial court committed manifest error by disregarding the unanimous conclusion of the medical review panel. We disagree.
Although admissible as evidence in a subsequently-filed malpractice action, the report of the medical review panel is not conclusive on the issue of liability. La. R.S. 40:1299.47(H); Carter v. Hebert, 05-1986, p. 4 (La.App. 1 Cir. 9/20/06), 943 So.2d 1191, 1193. Either party in such an action has the right to call any member of the panel as an expert witness. La. R.S. 40:1299.47(H). The weight assigned to the findings of the medical review panel is subject to the credibility determinations of *586 the fact finder. Ortego v. Jurgelsky, 98-1622, p. 10 (La.App. 3 Cir. 3/31/99), 732 So.2d 683, 689.
In the instant case, the medical review panel report reflects that Dr. Contreary “failed to comply with the appropriate standard of care as charged in the complaint and the conduct complained of was a factor in the resultant damages.” Under “Reasons,” the panel listed only one: “There is a lack of documentation in | ,8the record to support the indications for the June 7th operation.” Despite this conclusion, all three former members of the medical review panel testified at trial that, although Dr. Contreary’s documentation or record-keeping was substandard, he did not violate the standard of care by recommending and performing the June 7 surgery on Ms. Hainley.
In determining credibility, the trial court noted in its reasons for judgment that it had given “little weight” to the opinions of Dr. Dowling and Dr. Brown because of their inability to explain clearly why they had changed their minds from the time of the medical review panel opinion.[10] However, the court found Dr. Levy’s explanation to be persuasive. We do not find it unreasonable for the trial court to have departed from the opinion of the medical review panel based upon Dr. Levy’s testimony.

Ms. Orgeron

Appellant argues that the trial court misquoted Patricia Orgeron’s testimony in its reasons for judgment. According to the trial court, Ms. Orgeron’s testimony “provided the Court with critical information” in that she testified that her sister prior to the surgery “frequently complained of the abdominal pain she was experiencing,” which pain “was so great it interfered with Ms. Hainley’s ability to sit, stand and perform other activities of daily living.” Plaintiff argues that Ms. Orgeron did not testify that her sister’s pain interfered with the daily tasks of 113living, but only that it caused Ms. Hainley to go shopping and to the mall less frequently.
This argument is unpersuasive. Although the trial court’s written reasons may be helpful to an appellate court, our task is to determine whether the judgment itself, not the reasons for judgment, is manifestly erroneous or clearly wrong in light of the entire record. In the instant case, not only did Ms. Orgeron testify that Ms. Hainley was experiencing abdominal pain, but Ms. Orgeron’s husband, Sherril, testified that for six months prior to her admission to the hospital in June of 2000, Ms. Hainley complained about her stomach “often” and was “constantly making a noise that her stomach would hurt.”[11] It is not unreasonable for the trial court to have inferred from the evidence as a whole that Ms. Hainley’s stomach pain was interfering with her normal daily life. We therefore reject plaintiffs argument.
Issue Number Two
Plaintiff contends that the trial court’s misquoting of the language in the surgical consent form signed by Ms. Hain- *587 ley constitutes manifest error that warrants reversal of the judgment. In its reasons for judgment, the trial court noted that the consent form Ms. Hainley signed prior to the surgery stated “open abdomen to fix hernia and search for scar tissue.” (Emphasis supplied.) The consent form, which appeal's in the record, actually states, in Dr. Contreary’s handwriting: “open abdomen to fix hernia and remove scar tissue if possible. ” 12n(Emphasis supplied.) Plaintiff argues that no reasonable reading of this language would allow the conclusion that Ms. Hainley consented to exploratory surgery.
First, we note that, as defendants point out, lack of informed consent is not an issue in this lawsuit. The issue was not raised in the complaint to the medical review panel or in the plaintiffs petition; nor was it raised at trial in such a manner as to expand the pleadings. The only testimony at trial regarding the consent form related to whether or not the words used by Dr. Contreary on the form, which was part of the limited documentation he created prior to the June 7 surgery, supported his decision to perform the surgery.
Nevertheless, if lack of consent were at issue, we would not find the trial court’s misquoting of the form to be reversible error. The inclusion of the phrase “if possible” on the consent form indicates that Dr. Contreary had at least some uncertainty as to what he would find once he opened up Ms. Hainley’s abdomen. Therefore we do not agree with plaintiffs argument that no reasonable fact finder could have concluded that Ms. Hainley consented to exploratory surgery based upon this form alone. Moreover, Dr. Contreary testified that he had discussed the proposed surgery with Ms. Hainley; that she was not a neophyte when it came to abdominal surgery, having previously undergone both explorations and hernia repairs; that she knew the doctors did not have a definite explanation for her abdominal pain, and that she clearly understood the purpose of the surgery. Dr. Contreary’s testimony in this regard was uncontroverted. Therefore, we would not have found it unreasonable, considering the totality of the evidence, for the trial court to have concluded that informed consent existed. In any case, we do not agree that the trial court’s misquoting of the consent form constitutes manifest error.
1 .^CONCLUSION
In view of the record, we cannot say that the trial court’s finding no liability on the part of Dr. Contreary was manifestly erroneous or clearly wrong. Despite Dr. Contreary’s lack of documentation, a reasonable fact finder could have concluded that the preponderance of the evidence supported Dr. Contreary’s decision to perform surgery on Ms. Hainley. All but one of the medical experts testified that chronic abdominal pain, unaccompanied by clinical findings, may be an indication for exploratory surgery. Although the experts differed as to what each would consider “chronic,” most indicated this classification was a judgment call on the part of the treating physician. Dr. Verrette’s records confirm that Ms. Hainley was experiencing intermittent abdominal pain several months prior to the June 7 surgery. Ms. Hainley’s sister and brother-in-law, with whom she lived, both testified Ms. Hainley was experiencing abdominal pain. Although Dr. Contreary wrote simply “ventral hernia” on the preoperative assessment (“short stay form”) under “indications/symptoms for surgery,” other preoperative hospital records support his testimony that the surgery was exploratory to determine the cause of Ms. Hain-ley’s abdominal pain. For example, the Pre-Op Anesthesia Note lists the procedure as “Expl Lap, Ventral Hernia;” the *588 nurse’s notation on the Intra-Operative Record under “Pre-Op Diagnosis” is “Abdominal Pain Possible Ventral Hernia;” and the Patient Admission Assessment Record lists the “Reason for Admission” as “Abdominal pain.” In light of the complete record, we find no manifest error in the trial court’s conclusion that there was a sufficient indication for the June 7 surgery and that therefore Dr. Contreary did not violate the standard of care by performing it.
^Accordingly, we affirm the judgment of the trial court.
AFFIRMED.
LOVE, J., Concurs in the Results.

. Dr. Verrette’s office records reflect that he saw Ms. Hainley on March 9 and April 5, 2000. His office notes from the March visit state that Ms. Hainley was continuing to complain of intermittent abdominal pain; in addition, he noted both on March 9 and on April 5 that she had a ventral hernia Dr. Contrary’s records contain a consult note to Dr. Verrette indicating that Dr. Verrette had referred Ms. Hainley to him.

. "Lyse” means "to cause to undergo lysis." "Lysis” is defined as "a process of disintegration or dissolution (as of cells).” Webster's Collegiate Dictionary, Tenth Ed. 1997.

. Dr. Nichols' testimony related to Dr. Con-treary’s treatment of Ms. Hainley after she developed complications from the June 7 surgery, which treatment has not been raised as an issue on appeal.

. Hospital records show that when Ms. Hain-ley was admitted on June 6, 2000, she was 5 feet, 5 inches tall and weighed 194 pounds.

. COPD is an acronym for "chronic obstructive pulmonary disease.”

. A fistula is defined as “an abnormal passage leading from an abscess or hollow organ to the body surface or from one hollow organ to another and permitting passage of fluids or secretions.” Webster's Collegiate Dictionary, Tenth Ed. 1997.

. Dr. Verrette's affidavit does not appear in the record, and the transcript does not reflect that it was introduced into evidence. However, during his trial testimony, Dr. Verrette read portions of the affidavit, including this quote.

. Dr. Balliro also rendered an opinion concerning the use of mesh in the June 19 operation, but that opinion is not relevant to any of the issues raised on appeal.

. Plaintiff contends in her brief that the trial court found Dr. Balliro to be credible because the court "did not indicate that his testimony was untrustworthy."

. Dr. Dowling indicated that his opinion at the time of the medical review panel “was totally based upon the lack of documentation,” but he had since decided that the medical records, particularly Dr. Verretle's records, did contain sufficient indications for the surgery. It was undisputed, however, Dr. Verrette’s records were available to the medical review panel. Dr. Brown testified that, even at the time the medical review panel decision was rendered, he believed that Dr. Contreary had breached the standard of care only by failing to document his actions, but not by recommending or performing the June 7 surgery.

. The evidence showed that Ms. Hainley lived with Mr. and Mrs. Orgeron.