ROSEMARY LEDET, Judge.
| ¶ This is a medical malpractice case. This case involves an orthopedic surgeon’s alleged negligence in discharging a patient from the hospital, following a complicated knee replacement surgery, with a Hickman catheter in place without any order for its removal, use, or care.[1] The patient, Arthur Serpas, Jr., brought this malpractice suit against the surgeon, Dr. Robert Barrack. Based on the jury’s finding that Dr. Barrack did not breach the applicable standard of care in his treatment of Mr. Serpas, the trial court dismissed the suit. For the reasons that follow, we affirm.
FACTUAL BACKGROUND
In the fall of 2001, Mr. Serpas developed an infection in his previously implanted left prosthetic knee. Mr. Serpas’ problem with his left knee was long standing; it dated back to a football injury that he sustained in the 1960s when he [2was a teenager. In August 1998, Mr. Serpas had his first total knee arthroplasty (“TKA”) surgery, which was performed by Dr. James Butler.
From October 11 to 13, 2001, Mr. Serpas was hospitalized at Slidell Memorial Hospital (“SMH”) by his primary care physician, Dr. Thomas Hall, for cellulitis of his left, lower extremity. Following a course of intravenous antibiotics, Mr. Serpas was discharged. During the following month, Dr. Hall readmitted Mr. Serpas to SMH for a probable left knee infection. During this hospital stay, which was from November 9 to 14, 2001, Dr. Hall consulted with two specialists — Dr. Camile Bitar, an infectious disease specialist; and Dr. Brian Fong, an orthopedic surgeon. Both specialists concluded that Mr. Serpas had a septic left knee. Test results revealed that Mr. Serpas’ infection was a Lancefield Group B Streptococcus (Streptococcus agalactiae). At the time of discharge, Dr. Hall documented the possibility of treatment failure, requiring surgical intervention and possible removal of the prosthetic joint. Dr. Fong referred Mr. Serpas to Dr. Barrack, an orthopedic surgeon specializing in infected prosthetic removal and re-implantation of a new prosthetic knee and practicing at Tulane University Hospital and Clinic (“TUHC”).[2]
*731 On December 18, 2001, Mr. Serpas first presented to Dr. Barrack. According to Dr. Barrack, Mr. Serpas gave a history of having undergone an unsuccessful course of intravenous antibiotic treatment for his infected prosthetic left knee. At that time, Mr. Serpas’ left knee was “swollen, warm;” and Mr. Serpas ^requested surgical intervention. According to Mr. Serpas, Dr. Barrack informed him that antibiotics would no longer work and recommended that he undergo a two-stage surgical procedure at TUHC to remove and replace the infected artificial left knee. Mr. Ser-pas agreed to undergo the two-stage surgical procedure and signed the required consent forms.
On January 3, 2002, Dr. Barrack performed the first stage of the surgical procedure, which involved removing the artificial knee and installing a temporary antibiotic impregnated cement spacer.[3] As part of the two-stage procedure, Dr. Barrack also ordered the placement of a Hickman catheter. On January 4, 2002, a vascular surgeon placed the Hickman catheter in Mr. Serpas’ left subclavicle.[4] As noted in the consent form Mr. Serpas signed, the stated purpose for placing the Hickman catheter was for long-term intravenous antibiotics. The stated risks associated with the placement of the Hickman catheter included,' among other things, infection.
During Mr. Serpas’ hospital stay for the first stage of the surgical procedure, Dr. Barrack consulted an infectious disease specialist, Dr. Rodrigo Hasbun. The purpose of the consult was to determine the best antibiotic in the event that they discovered any new bacteria. Dr. Hasbun recommended six weeks of intravenous antibiotics before the re-implantation of the new knee prosthesis.
|4On January 7, 2002, Mr. Serpas was released from TUHC with the Hickman catheter in place and a course of intravenous antibiotics was ordered. The “Patient Transfer/Referral Form Physician’s Transfer Orders” dated January. 7, 2002, provided for home health nurse visits “QD [daily] for wound care & IV [intravenous] abx [antibiotics].” The intravenous antibiotics were administered daily by a home health nurse from Slidell Memorial Hospital Home Health, which was Mr. Serpas’ selected home health agency.[5] At that time, Mr. Serpas was living in Slidell, Louisiana.
Between the two surgeries, Mr. Serpas moved his residence from Louisiana to Mississippi. Apparently for this reason, Mr. Serpas selected a different home health agency following his discharge from TUHC on February 10, 2002. Specifically, he selected South Mississippi Home Health, which subsequently changed its name to Deaconness Home Health (“DHH”). (For ease of discussion we refer to this agency as DHH.)
On January 24, 2002, also between the two surgeries, Mr. Serpas returned to see Dr. Barrack. Dr. Barrack’s notes regarding this office visit were as follows:
Arthur Serpas returns today and his sed rate is returning towards normal at *732 41. The CRP is O. The incision is well-healed with no redness, erythema or drainage. The risks, benefits and alternative of reimplantation of a total knee following infection were, discussed with him. He’s anxious to proceed with this option and he is scheduled in about two weeks at which time he’ll be about six weeks from his component resection.
|sOn February 6, 2002, Dr. Barrack performed the second stage of the surgical procedure,[6] which was a more complex procedure than the first stage of the surgical procedure. It entailed removing the cement spacer and re-implanting a new left prosthetic knee. As discussed elsewhere in this opinion, during this procedure, a frozen section sample was taken of a worrisome area located behind the cement spacer. The results of this frozen section sample were abnormal, indicating the possibility of a continued infection.
On February 10, 2002, Mr. Serpas was discharged from TUHC with the Hickman catheter in place but with only oral antibiotics ordered. The “Patient Transfer/Referral Form Physician’s Transfer Orders” dated February 10, 2002 (the “2/10/02 Transfer Order Form”), provided for home health nurse visits “3X/wk [three times per week]” and “P[hysical] T[herapy] for TKA [total knee arthroplasty] 3x/wk.” The Hickman catheter was not mentioned on the form. Mr. Serpas’ sister, Patricia Boe, transported him home from the hospital that day. Both Mr. Serpas and Ms. Boe denied receiving any instructions or supplies for cleaning the Hickman catheter.[7] However, they both admitted that the discharge nurse instructed Mr. Serpas to contact the home health agency.
DHH’s records, which were introduced at trial, reflect that the home health agency’s first 'visit to Mr. Serpas’ house in Mississippi was on February 26, 2002. | (¡Nonetheless, Mr. Serpas represented at trial that a DHH nurse came to his house on February 13, 2002. He indicated that the nurse was surprised to see that he had a Hickman catheter in place and that she told him she had no orders regarding the Hickman catheter. He further indicated that the nurse called her supervisor and waited at his house for about an hour for additional orders. Because the nurse’s supervisor was unable to reach Dr. Barrack to obtain additional orders,[8] the nurse left without either cleaning or maintaining the Hickman catheter. However, other than Mr. Serpas’ testimony, the record is devoid of any evidence that a home health nurse visited Mr. Serpas’ house on February 13, 2002.[9] It is undisputed that no other home *733 health nurse visit occurred between February 10 and 16, 2002.
On February 16, 2002, Mr. Serpas attended physical therapy at Slidell Memorial Hospital Rehabilitation Center with Lauri Boutte. Ms. Boutte noted that the surgical staples had been removed and replaced by steri-strips.[10] She also noted |7that the Hickman catheter was in place; however, Mr. Serpas did not inform her of any home health nurse’s visit since his February 10, 2002 discharge.
On the same day that he attended physical therapy, February 16, 2002, Mr. Serpas became very ill, was transported by ambulance to SMH, and was subsequently admitted. His admitting diagnosis was sepsis. Test results revealed that Mr. Serpas’ infection was Pseudomonas aeruginosa — a different infection than the Lancefield Group B Streptococcus (Streptococcus agalactiae) that he was treated for in the fall of 2001. Throughout his hospital stay at SMH, Mr. Serpas’ differential diagnosis included the Hickman catheter as a possible source of the infection. Nonetheless, for several days after his admission, his treating doctors continued to use the Hickman catheter for, among other things, administration of intravenous antibiotics and blood cultures. On February 20, 2002, the Hickman catheter was removed because it was no longer needed.[11] On February 26, 2002, Mr. Serpas was released from SMH. As noted above, the home health agency’s (DHH’s) first documented visit to Mr. Ser-pas’ house in Mississippi was on this same date.
| ^During Mr. Serpas’ February 2002 hospital stay at SMH, Dr. Barrack was not involved in Mr. Serpas’ care.[12] On March 12, 2002, Mr. Serpas returned to see Dr. Barrack. In his “Physician’s Progress Note” for this visit, Dr. Barrack noted:
Arthur [Serpas] returns status post two stage revision for infection on 2/6/2002. Since that time he had systemic infection and was admitted to the hospital with a Pseudomonas septicemia. *734 There is a suspicion that his knee joint may have been involved. Currently, his knee is only minimally painful and he’s just finished a course of antibiotics. We will monitor his sed rate and CRP. He’ll return in four to six weeks for reevalution and possible aspiration at that time.
Mr. Serpas never returned to see Dr. Barrack.
PROCEDURAL BACKGROUND
On December 30, 2002, Mr. Serpas filed a complaint requesting that a Medical Review Panel (“MRP”) be convened, in accordance with the applicable provisions of the Medical Malpractice Act, La. R.S. 40:1299.41, et seq. In his complaint, he requested the MRP review the treatment that he received from Dr. Barrack and TUHC’s employees from January 3, 2002, through February 16, 2002. The alleged malpractice did not relate to Dr. Barrack’s performance of the two-stage knee replacement surgery; rather, it related to the sepsis (infection) that Mr. Serpas developed following his discharge from TUHC on February 10, 2002. More particularly, the alleged negligence related to Dr. Barrack’s discharge of Mr. Serpas with a Hickman catheter in place without any order for the removal, use, orneare of it. The gist of Mr. Serpas’ claim was as follows: there was no order for the care of the Hickman catheter; as the result of the lack of an order, the catheter was not cleaned by the home health agency; and the catheter became infected.
On April 20, 2004, a MRP was convened. The MRP was composed of two orthopedic surgeon specialists' — Dr. Kurt Kitziger and Dr. Marshall Book — and one infectious disease specialist — Dr. Jeffrey Coco. Following its review of the evidence submitted to them and Mr. Serpas’ complaint, the MRP issued an opinion. The MRP unanimously found that Dr. Barrack breached the standard-of care because “[tjhere is no documented indication for the continuation of intravenous antibiotics after discharge on February 10, 2002.” The MRP further found that “the conduct complained of by Dr. Barrack was a factor of the patient’s re-admission for line sepsis on or about February 17, 2002. There appears to have been no long-term consequence following resolution of the septic episode.”[13]
On June 24, 2004, Mr. Serpas commenced this suit against Dr. Barrack based on the same allegations of malpractice as alleged in his complaint.[14] From February 25, 2013, to March 1, 2013, a jury trial was held in this matter. At trial, the parties stipulated to the following facts:
• Plaintiff Arthur Serpas developed an infection in his left prosthetic knee in November 2001.
| Tn* Mr. Serpas sought treatment from Defendant Dr. Robert Barrack.
• Dr. Rodrigo Hasbun, an infectious disease specialist, was consulted regarding Mr. Serpas’ knee, who recommended six weeks of intravenous antibiotics prior to re-implantation of the new knee prosthesis.
• Mr. Serpas signed consent documents with regard to all surgeries at issue in this matter.
*735 • On January 3, 2002, the infected knee prosthesis was removed and the antibiotic spacer was implanted by Dr. Barrack.
• On January 4, 2002, a Hickman catheter was surgically implanted into Mr. Serpas by a surgeon.
• After removal of the knee prosthesis and implantation of an antibiotic impregnated cement spacer, Mr. Serpas was discharged on January 7, 2002 with a course of intravenous antibiotics to be administered through the Hickman catheter.
• On February 6, 2002, Dr. Barrack removed the antibiotic cement spacer and re-implanted a new left prosthetic knee.
• After removal of the spacer and re-implantation of a new knee prosthesis, Mr. Serpas was discharged from Tulane University Hospital on February 10, 2002.
• Prior to his discharge from Tulane University Hospital on February 10, 2002, no doctor ordered removal of the Hickman catheter.
• At the time of Mr. Serpas’ discharge on February 10, 2002, there were no orders for post-discharge intravenous antibiotics.
• Mr. Serpas was discharged from Tulane University Hospital on February 10, 2002 with the Hickman catheter in place.
• On February 16, 2002, Mr. Serpas attended physical therapy at Slidell Memorial Hospital.
At trial, nine witnesses testified. Seven of the witnesses were qualified as experts; these witnesses and their qualifications were as follows:
• Dr. Arlen Hanssen was qualified as an expert in hip and knee replacement with a focus on infected joint replacement; Dr. Hanssen testified as an expert on Dr. Barrack’s behalf;
In*Dr. Marshall Book was qualified as an expert in orthopedics. Dr. Book was a member of the MRP in this case. Dr. Book testified as an expert on Mr. Ser-pas’ behalf;
• Dr. Jeffrey Coco was qualified as an expert in infectious disease who has consulted with orthopedic surgeons on numerous occasions using Hickman catheters and other devices. Dr. Coco was a member of the MRP in this case. Dr. Coco testified as an expert on Mr. Serpas’ behalf;
• Dr. Thomas Hall was qualified as an expert in internal medicine. Dr. Hall was Mr. Serpas’ primary care physician and treated Mr. Serpas during his 2001 and 2002 SMH admissions. Dr. Hall testified as an expert on Mr. Ser-pas’ behalf;
• Lauri Boutte was qualified as an expert in the field of physical therapy. Ms. Boutte was the physical therapist who saw Mr. Serpas on February 16, 2002, at Slidell Memorial Hospital Rehabilitation Center. Ms. Boutte testified as an expert on Mr. Serpas’ behalf;
• Richard MacMillan, who was both a registered nurse and an attorney, was qualified as an expert in the field of regulation of nurses in the states of Louisiana and Mississippi to perform their duties and how orders are generated between physicians and home health agencies. Mr. MacMillan testified as an expert on Mr. Serpas’ behalf; and
• Dr. Barrack was qualified as an expert in the field of orthopedic surgery and the treatment of knee replacement. Dr. Barrack is the defendant in this case.
*736 The other two witnesses were the plaintiff, Mr. Serpas, and his sister, Patricia Boe. The exhibits introduced at trial included the MRP’s opinion and certified copies of Mr. Serpas’ extensive medical records.
At the close of Mr. Serpas’ case, the trial court denied Dr. Barrack’s motion for a directed verdict. At the close of the five-day trial, the jury returned a verdict finding that Dr. Barrack did not breach the applicable standard of care in his treatment of Mr. Serpas. Pursuant to the instructions on the jury interrogatories form and in light of the jury’s negative response to the first interrogatory,[15] the jury 112did not reach the subsequent questions of causation or damages. On March 15, 2013, the trial court rendered a judgment in accord with the jury’s verdict, in favor of Dr. Barrack, dismissing Mr. Serpas’ claims with prejudice. On June 12, 2013, the trial court denied Mr. Serpas’ post-trial motions for Judgment Notwithstanding the Verdict (“JNOV”) and, in the alternative, for new trial (the “Post-Trial Motions”). This appeal followed.
STANDARD OF REVIEW
In civil cases, including medical malpractice cases, Louisiana appellate courts apply the manifest error or clearly wrong standard of review to a trier of fact’s factual findings. Jackson v. Tulane Medical Center Hosp. and Clinic, 05-1594, p. 5 (La.10/17/06), 942 So.2d 509, 512; Johnson v. Ray, 12-06, 12-07, p. 6 (La.App. 4 Cir. 12/5/12), 106 So.3d 629, 635 (citing McCarter v. Lawton, 09-1508 (La.App. 4 Cir. 7/21/10), 44 So.3d 342). Under that standard, an appellate court may not set aside the findings of the trier of fact— in this case, a jury — unless the findings are clearly wrong or manifestly erroneous. Detraz v. Lee, 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561; Stobart v. State Through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In order to reverse a fact-finder’s determination, an appellate court must review the record in its entirety and make the following two determinations: (i) that a reasonable factual basis does not exist for the finding, and (ii) that the record establishes that the fact-finder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126, p. 5 (La.7/6/06), 935 So.2d 646, 650. As the Louisiana Supreme Court has instructed, “an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.” Eisenhardt v. Snook, 08-1287, pp. 6-7 (La.3/17/09), 8 So.3d 541, 545 (citing Ambrose v. New Orleans Police Dep’t Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221); Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 279. The issue to be resolved by the reviewing court is not whether the fact-finder was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Stobart, 617 So.2d at 882. Simply stated, “[w]here there are two permissible views of the evidence, the fact-finder’s choice cannot be manifestly erroneous or clearly wrong.” Wallace v. Howell, 09-1146, p. 2 (La.App. 4 Cir. 1/13/10), 30 So.3d 217, 218; see also Rosell, 549 So.2d at 844.
When there is conflicting expert testimony concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to *737 the fact-finder’s conclusion. Landeche v. McSwain, 96-0959, p. 10 (La.App. 4 Cir. 2/5/97), 688 So.2d 1303, 1309.
 The medical review panel’s opinion “is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit.” Samaha v. Rau, 07-1726, p. 15 (La.2/26/08), 977 So.2d 880, 890; Galloway v. Baton Rouge General Hosp., 602 So.2d 1003, 1006 (La.1992). The admissibility of the panel’s expert opinion is expressly provided for by statute; La. R.S 40:1299.47(H) provides that “[a]ny report of the expert opinion reached by the 114medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party[ — the patient or the qualified healthcare provider — Jshall have the right to call, at his cost, any member of the medical review panel as a witness.” As with any expert testimony or evidence, the medical review panel’s opinion is subject to review and to contestation by an opposing viewpoint. Samaha, 07-1726 at p. 15, 977 So.2d at 890.
Although admissible as evidence in a subsequently-filed malpractice action, the medical review panel’s opinion is not conclusive on the issue of liability. La. R.S. 40:1299.47(H); McGlothlin v. Christus St. Patrick Hosp., 10-2775, p. 9 (La.7/1/11), 65 So.3d 1218, 1226-27; Carter v. Hebert, 05-1986, p. 4 (La.App. 1 Cir. 9/20/06), 943 So.2d 1191, 1193. The weight assigned to the findings of the medical review panel is subject to the credibility determinations of the fact-finder. Orgeron v. Louisiana Medical Mut. Ins. Co., 08-0179, p. 17 (La.App. 4 Cir. 12/3/08), 1 So.3d 576, 585-86; Ortega v. Jurgelsky, 98-1622, p. 10 (La.App. 3 Cir. 3/31/99), 732 So.2d 683, 689. The jury, as the fact-finder, is free to accept or reject any portion or all of the opinion. McGlothlin, supra.
Questions of law are reviewed under a de novo standard of review. Caldwell v. Janssen Pharmaceutical, Inc., 12-2447, p. 9 (La.1/28/14), 144 So.3d 898, 906, 2014 WL 341038 (collecting cases).
The standard for review for a JNOV is the following two-part inquiry.
First, using the same criteria the trial court uses in deciding whether to grant JNOV, the appellate court must determine if the trial court erred. Bigelow v. Crescent Title, L.L.C., 08-0932 p. 6 (La.App. 4 Cir. 10/15/08), 997 So.2d 83, 87; citing Davis v. Wal-Mart Stores, Inc., 00-0445, p. 5 (La.11/28/00), 774 So.2d 84, 89. “The standard for granting or denying a JNOV is the same as that for a directed verdict — whether reasonable minds could differ.” Id.; citing Frank L. |1fiMaraist and Harry T. Lemmon, 1 LOUISIANA CIVIL LAW TREATISE, CIVIL PROCEDURE § 13.4 (1999); see La Code. Civ. Proc. art. 1811. [Second, a]fter determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Bigelow v. Crescent Title, L.L.C., 997 So.2d at 87.
Hammons v. St. Paul, 12-0346, pp. 5-6 (La.App. 4 Cir. 9/26/12), 101 So.3d 1006, 1010-11.
A motion for new trial requires “a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury.” Davis v. Wal-Mart Stores, Inc., 00-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93. A trial court’s ruling on a motion for new trial is reviewed under an abuse of discretion standard. Jackson v. *738 Bally’s Louisiana, Inc., 09-1574, p. 4 (La.App. 4 Cir. 4/7/10), 36 So.3d 1001, 1003-04; Campbell v. Tork, Inc., 03-1341, p. 4, n. 5 (La.2/20/04), 870 So.2d 968, 971 (citing La. C.C.P. art.1971, Official Revision Comment (d), which states “[although the trial court has much discretion regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court’s ruling aside, or grant a new trial when timely applied for.”).
DISCUSSION
On appeal, Mr. Serpas asserts the following two assignments of error: (1) whether the trial court erred in finding that Dr. Barrack did not breach the standard of care when he allowed Mr. Serpas to be discharged from the hospital with a Hickman catheter in place without any written physician orders for the removal, use, or care of the Hickman catheter; and (2) whether the trial court erred in denying the Post-Trial Motions. We separately address each issue.

Breach of the Standard of Care

| ifiA plaintiff asserting a medical malpractice claim is required to establish, by a preponderance of the evidence, the following three elements: “(i) the applicable standard of care, (ii) a breach of that standard of care, and (iii) a causal connection between the breach of care and the patient’s injury.” In re Brown, 11-1824, p. 3 (La.App. 4 Cir. 2/20/13), 156 So.3d 661, 664, 2013 WL 633101, writ denied, 13-0863 (La.5/24/13), 117 So.3d 512 (citing Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228, 1233). As noted, the jury in this case reached only the first element. The jury’s negative response to the first jury interrogatory— whether Dr. Barrack “breached the applicable standard of care in his treatment of plaintiff, Arthur Serpas, Jr.” — allowed the jury to pretermit reaching the other two elements. Because we find no error in the jury’s finding, we likewise do not reach the other elements.
The applicable standard of care in this case, as noted by the trial court in its reasons for denying the Post-Trial Motions, is set forth in the following jury instructions:
If you find the physician exercised the degree of skill ordinarily employed under similar circumstances by the members of his profession in good standing in the same medical specialty and used reasonable care and diligence along with his best judgment, in the application of his skill to the case, then you are to return a verdict in favor of the defendant.
If, on the other hand, you find that physician lacked this degree of knowledge or skill, or failed to use reasonable care and diligence or skill, or failed to use reasonable care and diligence, along with his best judgment, and such failure was a substantial factor in bringing about the incident of plaintiffs harm, then you must find against the defendant in favor of the plaintiff.
[[Image here]]
Therefore, if you find that the defendant neglected to order the use, removal, or care of the Hickman catheter on a timely basis, you may find that the defendant acted below the standard of care.
|17A physician’s professional judgment and conduct must be evaluated in terms of reasonableness under the circumstances that existed at the time, not in terms of, or in light of events that later follow.
At trial, Mr. Serpas’ allegations of malpractice — professional negligence — on Dr. Barrack’s part were three-fold:
*739 1. Discharging of Mr. Serpas with an unnecessary foreign body — a Hickman catheter — implanted in him;
2. Failing to issue any orders on discharge relative to the Hickman catheter; and
3. Failing to monitor Mr. Serpas’ condition with regard to the Hickman catheter after discharge when he went to Dr. Barrack’s office to have the surgical staples removed and the Hickman catheter was not removed, inspected, or tended to in any fashion.
The jury’s apparent rejection of the first and third allegations requires little discussion. First, as to Mr. Serpas’ discharge with the Hickman catheter in place, Dr. Coco, the non-orthopedic MRP member, testified that the Hickman catheter should have been removed before the February 10, 2002 discharge date. He explained that, at the time of the discharge, the catheter had already been in place for about six weeks. He opined that Mr. Serpas had none of the contraindications that would have required leaving the Hickman catheter in place in case of future infections. Continuing, he opined that after the aerobic culture came back negative on February 8, 2002, the Hickman catheter should have been removed before Mr. Ser-pas was discharged. Moreover, he stated that “[i]f there was no need for I.V. [intravenous] antibiotics, leaving the catheter in would have been a moot point. So, without a documented indication for continuation of I.V. [intravenous] antibiotics, [Mr. Serpas] didn’t need the catheter.”
|1sIn contrast, both Dr. Barrack and his expert orthopedic specialist, Dr. Hanssen, testified to the contrary. Dr. Barrack testified that he decided, by February 7, 2002, to leave the Hickman catheter in place upon discharge for several reasons. The primary reason, he explained, was the abnormal results of the frozen section sample that was taken during the second stage of the surgical procedure. As noted earlier, the frozen section sample was taken from a worrisome area behind the cement spacer. According to Dr. Barrack, the results of the frozen section sample indicated that Mr. Serpas had a high risk of a persistent infection that could require administering additional intravenous antibiotics. Dr. Barrack testified that he wanted to see Mr. Serpas in fourteen days after the surgery to examine the wound and to make the final determination on removing the Hickman catheter.
Dr. Barrack’s decision to leave the Hickman catheter in place was supported by the testimony of his expert orthopedic surgeon, Dr. Hanssen. Dr. Hanssen, like Dr. Barrack, specialized in the area of replacing infected artificial joints. Dr. Hanssen characterized the Hickman catheter as the “gold standard” for long-term intravenous antibiotic access. He explained that, unlike peripheral lines, the tubing in the Hickman catheter tunnels under the skin into the vein, making Hickman catheter infections a “very rare phenomenon.”[16] In response to the trial court’s question of whether it is a rare occurrence for a Hickman catheter to become infected, Dr. Hanssen replied “[i]n my experience.” Explaining his experience, Dr. Hanssen testified that in his twenty-two years of replacing infected artificial joints, 1inhe has never once had a patient develop an infected Hickman catheter. More particularly, he testified that between 1990 and 2000, he had 371 patients in whom he ordered the installation of a Hickman catheter; none of *740 these patients developed an infection. For this reason, Dr. Hanssen testified that it is very common for orthopedic surgeons to leave Hickman catheters in for a long period of time.
In response to the question of whether it would be a violation of the standard of care to discharge Mr. Serpas without removing the Hickman catheter, Dr. Hanssen replied “[a]bsolutely not.” Dr. Hanssen explained that he would not take a Hickman catheter out before receiving the final culture reports — which had not been received when Mr. Serpas was discharged — “[b]e-cause it’s a surgical procedure to take it out. And if one of those cultures becomes positive, I need to have some way to get antibiotics in him. So, the best thing is for me to leave that in until I know all the cultures are done and then I take it out.” The jury thus had a basis for finding no negligence on Dr. Barrack’s part for leaving the Hickman catheter in place on discharge.[17]
Turning to the allegation that Dr. Barrack failed to monitor the Hickman catheter when the surgical staples were removed at his office on February 15, 2002, the only evidence that Mr. Serpas had his staples removed at Dr. Barrack’s office was Mr. Serpas’ trial testimony. Dr. Hanssen testified that he saw no evidence that the staples were removed at Dr. Barrack’s office. The discharge instructions did not indicate where the staples were to be removed. Moreover, Dr. Barrack testified that the protocol was for the home health nurse to remove the staples ten days after the surgery, absent some concern regarding the wound, and | anfor him to see the patient fourteen days after the surgery. In the event there was a concern, Dr. Barrack testified that an appointment would be made for the removal of the stitches; and a physician would examine the wound at that appointment. The record is devoid of any such appointment. We thus find no manifest error in the jury’s apparent rejection of the first and third allegations of negligence.
The remaining allegation of negligence — failing to issue any orders on discharge relative to the continuation of care for the Hickman catheter — is the focus of Mr. Serpas’ argument on appeal. Mr. Ser-pas contends that the evidence presented at trial established that, at a minimum, an order for the care and maintenance of the Hickman catheter upon discharge was necessary to comply with the standard of care. Dr. Barrack does not dispute this point. The narrow issue is thus whether Dr. Barrack met the standard of care in providing an order for the maintenance and care of the Hickman catheter upon Mr. Serpas’ discharge.
Mr. Serpas’ primary support for his argument that the jury erred in failing to find that Dr. Barrack breached the standard of care is the MRP’s unanimous opinion. As noted, the MRP found that Dr. Barrack breached the standard of care because there was no documented indication for the continuation of intravenous antibiotics after Mr. Serpas’ Februáry 10, 2002 discharge. Translated, this was a shorthand way of finding that there were no orders for the continuation of care or cleaning of the Hickman catheter following Mr. Serpas’ discharge.[18] The two MRP *741 | ^members who testified at trial — Dr. Coco and Dr. Book[19] — both explained that the reason for the panel’s unanimous finding that Dr. Barrack breached the standard of care was that they could not find any documentation by a doctor or nurse at TUHC that Dr. Barrack acknowledged the Hickman catheter was in place and that he gave instructions regarding caring for the catheter on discharge. Indeed, they testified that the other non-testifying MRP panel member, Dr. Kitziger, spent the whole evening before the panel convened searching for such documentation.
Although the MRP opinion that Dr. Barrack breached the standard of care was unanimous, one of the two testifying panel members, Dr. Book, retracted his opinion at trial. As the trial court noted in denying the Post-Trial Motions, Dr. Book explained that he and the other two MRP members — Dr. Coco and Dr. Kitziger— could not decipher the discharge nurse’s handwritten notation contained in the February 10, 2002 Medical/Surgical Flow Sheet (the “Discharge Nurse’s Note.”). Continuing, Dr. Book explained that the MRP members were looking for a notation in the progress note or the discharge summary regarding the Hickman catheter. They neither appreciated nor saw that their copy of the 2/10/02 Transfer Order Form referenced other parts of the medical record (Part 1 — Referral, Part 2— Chart, and Part 8 — Social Services) that contained Dr. Barrack’s discharge instructions for the care of the Hickman catheter. Dr. Book testified that when the 2/10/02 Transfer Order Form was read together with the Discharge Nurse’s Note, it demonstrated that Dr. Barrack had provided orders for the continuity of care of the Hickman catheter. He thus retracted his opinion that Dr. Barrack had breached the standard of care.
li>i>At trial, Dr. Coco and Dr. Barrack deciphered line-by-line the Discharge Nurse’s Note, which Dr. Book noted the MRP members had difficulty reading, as follows:
11:15 — D/ced [Discharged] from 7E, given Verbal/written instructions on medications, activity & follow-up @ clinic. Verbalized understanding of instruction, notified transportation of D/C [discharge] by WC [wheelchair],
A [change] (L) subclavian dsg [dressing]
A [change] ports.
11:30 — Departing 7E now per wheelchair.
12:30 — Notified Ms. Burkes @ 601-798-2545 and gave Report.
Also at trial, the following question was posed to both Dr. Book and Dr. Coco: whether the Discharge Nurse’s Note contained the documentation that the MRP members were looking for in the medical records establishing the continuity of care for the Hickman catheter. Dr. Coco answered no; Dr. Book answered yes. We briefly summarize the contradictory testimony of each of the testifying MRP members on this point.
*742 Maintaining his position that Dr. Barrack breached the standard of care, Dr. Coco testified that the Discharge Nurse’s Note simply “documented that she did her work that day” — a routine subclavian change. Dr. Coco testified that “[i]f that [discharge] nurse would have said, Dr. Barrack called, subclavian line to be left in, orders executed [for continuation of care of the line, ie., instructions given to the home health agency], that’s all that would have happened, that would have been perfect.” Dr. Coco, however, testified that the Discharge Nurse’s Note did not say that; rather, the note simply documented that the nurse did a routine subclavian change and that a later report was given.
123As to the reference to a “report,” Dr. Coco testified that no one really knows what was in the report that the discharge nurse gave.[20] He noted that “[i]f this nurse gave a report [to the home health agency] and said there was a port, the [home health agency] nurse on the other line would [have asked] ... do we have orders for care of that port?” Instead, he testified that he was told that the home health agency nurse who Mr. Serpas testified visited his house on February 13, 2002, “seemed shocked and surprised by the fact that there was no orders and there was a port there.”[21] Finally, Dr. Coco agreed that “[i]f this [discharge] nurse would have documented that she gave a report and that the line care was ordered and that the Mississippi home health agency ... would have acknowledged that they knew it was reported and done that, I think that would have tied everything together quite well.”
Retracting his position that Dr. Barrack violated the standard of care, Dr. Book testified that if the deciphered Discharge Nurse’s Note would have been at his disposal at the time the MRP convened, he would' not have found that Dr. Barrack breached the standard of care. Dr. Book testified that the Discharge Nurse’s Note would have indicated to him, had he put in motion these discharge instructions, that he had “a purpose or a reason, after evaluating the condition of this patient, for keeping the Hickman catheter line in because [he] may use it in the near future.” Dr. Book further testified that “it appears from this record that some instructions were given.” Although Dr. Book testified that the documented discharge instructions were less than what he would have given, he opined at trial 124that Dr. Barrack did not breach the standard of care.[22] As the trial court pointed out, Dr. Book testified that his reading of the Discharge Nurse’s Note in conjunction with the 2/10/02 Transfer Order Form, which linked together other parts of the medical record, provided sufficient evidence that Dr. Barrack provided instructions for the continuity of care for the Hickman catheter.
On appeal, Mr. Serpas contends that Dr. Barrack’s reliance on the Discharge Nurse’s Note as establishing that an order for the care of the Hickman catheter was given to the home health agency is misplaced, factually and legally. Factually, Mr. Serpas contends that Dr. Barrack, in an apparent attempt to cure the deficiency *743 of the lack of any single, signed doctor’s order, mischaracterizes the Discharge Nurse’s Note as the required physician’s order. He contends that the Discharge Nurse’s Note is not a physician’s order; rather, it is a cryptic nurse’s note. Mr. Serpas further contends that the problem with Dr. Barrack’s reliance on the Discharge Nurse’s Note is that there is no evidence that the discharge nurse faxed “physician instructions” or an order regarding the care of the Hickman catheter. To the contrary, he contends that, as Dr. Coco testified, the discharge nurse’s “report” was simply a report on what she had done, not what a home health agency was supposed to do in the future.
Legally, Mr. Serpas contends that Dr. Barrack’s attempt to have the court infer from the Discharge Nurse’s Note that a proper physician order was given for the care of the Hickman catheter is contrary to Louisiana statutory law governing home health agencies. According to Mr. Serpas, under Louisiana law, a home | ^health agency can act only pursuant to a specific physician’s order. In support, he cites La. R.S. 40:2116.31(B)(3), which defines a “home health agency” as follows:
“Home health agency” means a state-owned and operated agency, or a subdivision of such an agency or organization, or a private nonprofit organization, or a proprietary organization which provides for the skilled home healthcare to the public, under the order of a physician and in the place of residence of the person receiving the care, which includes at least skilled nursing and one other service listed in the minimum standards which may be physical therapy, speech therapy, occupational therapy, medical social services, home health aides, or such others as may be listed in the minimum standards.
He emphasizes that, by legal definition, a home health agency only acts “under order of a physician.” Id. In addition, he cites La. R.S. 40:2116.34(A)(1), which provides:
A. The secretary of the department shall prescribe and publish minimum standards pursuant to the Administrative Procedure Act.1 Such standards shall include but not be limited to the following:
(1) Requiring all such home health agencies to admit patients for skilled care only on the order of a physician. Signed physician’s orders shall be obtained by the agency.
Mr. Serpas submits that the above-quoted statutory provisions impose a legal requirement that would preclude any home health agency from taking care of a Hickman catheter without a formal, signed physician’s order. He contends that these statutory provisions dictate that a home health agency is permitted to act “only on order of a physician” and that the agency is required to maintain “signed physician’s orders” in its records.
Mr. Serpas acknowledges that there is a caveat. The caveat was explained at trial by Mr. Serpas’ expert, Mr. MacMillan — an attorney and a nurse — who testified that, under Louisiana law, a home health agency can act on a physician’s oral order provided that a signed written order is received within thirty days of the 18fiverbal order.[23] Based on the caveat, Mr. Serpas contends that even assuming, arguendo, the discharge nurse faxed verbal physician instructions, which were obtained from Dr. Barrack, to the home health agency, Louisiana law requires that the verbal instructions be followed up with a written, signed *744 physician’s order. The record is devoid of any such written, signed physician order. Mr. Serpas thus contends that the jury’s finding that Dr. Barrack did not breach the standard of care is contrary to the Louisiana statutory provisions governing home health agencies.
The record reflects, as Mr. Serpas contends, the lack of any single document in the TUHC’s medical record stating “clean his catheter” after his discharge. Indeed, Dr. Barrack acknowledged that there is no “single, solitary document signed by a doctor, that is part of the TUHC medical records that says clean Mr. Serpas’ Hickman catheter after February 10, 2002.” Dr. Barrack, however, testified that “[tjhere is none and there is none necessary to provide for the care. And it’s not our protocol to routinely provide that.”[24]
Explaining the protocol he routinely follows, Dr. Barrack testified that TUHC employs a discharge planning process, which has become standard at most major medical centers. The purpose of the discharge planning process, he explained, is to ensure patients obtain an “efficient, predictable process of postoperative care.”[25] According to Dr. Barrack, the discharge planning process atj^TUHC begins immediately after surgery to alert the case management team that an orthopedic care coordinator will be assigned to the patient.[26] The discharge planning process in this case began with the February 6, 2002 post-operative order, signed by the orthopedic resident working under Dr. Barrack’s supervision, Dr. Michael Heilig, for a consult to TUHC’s Orthopedic Care Coordinator (the “Consult”).[27]
According to Dr. Barrack, Dr. Heilig’s signed order for the Consult triggered the cascade of events needed to implement the required home healthcare as per his discharge instructions.[28] Based on the Con- *745 suit, Shelby Hopkins, who generally was assigned to handle Dr. Barrack’s patients, was assigned to be Mr. Serpas’ orthopedic care coordinator. Ms. Hopkins then made rounds with Dr. Barrack to learn his anticipated discharge needs for Mr. Serpas and to formulate a discharge plan for him.
|2SPr. Barrack testified that by February 7, 2002, his discharge plan for Mr. Serpas was “pretty complete;” it provided for the following: “Mr. Serpas to be discharged to home health with a Hickman catheter in place and to have daily dressing changes of his knee wound, to have home health visit every three days, to change his dressings on his site, his Hickman catheter, and for him to have rehabilitation which ... had been arranged with Slidell home health.” Dr. Barrack explained that given the results of the frozen section sample, he knew he was going to discharge Mr. Serpas with the Hickman catheter in place. At this juncture, the only remaining issue was whether they were going to “go with I.V. [intravenous] antibiotics, which decision had not yet been made.” He testified that he communicated this information to Ms. Hopkins, whose job it was to interface and to communicate with the home health agency selected by Mr. Serpas, DHH.
Illustrative of Dr. Barrack’s communication with Ms. Hopkins regarding Mr. Ser-pas’ discharge to the home health agency was Ms. Hopkins’ February 7, 2002 Case Management Note (the “Case Management Note”), which stated:
Mr. Serpas does not want to go to inpt [in patient] rehabilitation] and would like to go home with home health. I have called South Ms [Mississippi] Home Health and spoke to Debbie. Her number is l[-]800-844-1421. I have faxed the paperwork to her at 601-798-2545. Please call and let them know as soon as you know the pt [patient] will be discharge^].
I have asked both physician’s [sic] if the pt [patient] will need iv [intravenous] abx [antibiotics], they were not sure at this point and if he does, they were not sure which abx the pt will need. If the pt does need abx, the home health agency will need to know as soon as possible so they can set it up.
Dr. Barrack testified that that the Case Management Note indicated that Ms. Hopkins had met with Mr. Serpas and determined his wishes; Mr. Serpas wanted to use a different home health agency than he used after the first operation. The Case ^Management Note also indicated that Ms. Hopkins was awaiting Dr. Barrack’s verbal communication to her of his order regarding any post-discharge use of the Hickman catheter for intravenous antibiotics so that she could inform the home health agency.[29] Dr. Barrack explained that the home health agency needed to know as soon as possible so that they could set up the infusion therapy if he decided to go that route. The Case Management Note also documented Ms. Hopkins’ contact with the home health agency and the agency’s fax number that she used to send the necessary paperwork.
Dr. Barrack emphasized that the same fax number that is listed in Ms. Hopkins’ Case Management Note — 601-798-2545— appears in the Discharge Nurse’s Note. According to Dr. Barrack, the Discharge Nurse’s Note reflects that his instructions for the continuity of care of the Hickman catheter, which were communicated to Ms. Hopkins, ultimately were given by the discharge nurse to Mr. Serpas’ selected home *746 health agency, DHH. Dr. Barrack explained that the discharge nurse “gave the report that was prepared by Shelby Hopkins” to the home health agency. Although he acknowledged that he could not say — eleven years after the fact — whether he saw the report that Ms. Hopkins prepared, he testified that he could say that he “discussed with her [Ms. Hopkins] the [discharge] plan two days earlier, and she prepared the report for this nurse because this is a discharge nurse who would have no way of knowing the name or phone number or fax number of this [home health agency] individual.” He testified that he “had a conversation with Shelby [Hopkins] that we were going to maintain the line [Hickman catheter] and we’re going to decide whether or not to use |30antibiotics through the line or orally, which we conveyed to her [Ms. Hopkins], and she had to prepare that report for this nurse.” He further explained that he knew what the discharge nurse reported — what Ms. Hopkins provided to the discharge nurse for her to report — based on the discharge plan that they had agreed upon.[30] Dr. Barrack testified that this is corroborated by the Case Management Note, which indicates that the information — that Mr. Serpas had a catheter in place — was conveyed to this same home health agency at this same fax number two days earlier.
Although Dr. Barrack acknowledged that the 2/10/02 Transfer Order Form did not have the information that the home health agency needed regarding maintaining the Hickman catheter, he testified that the information was contained in the faxes that Ms. Hopkins and the discharge nurse sent to the home health agency on February 7 and 10, 2002, respectively. Dr. Barrack explained that “these agencies more often than not provide their own forms with menus of options that the case managers fill out and send to them. And we know these faxes occurred and we don’t have copies of these faxes.”[31]
Dr. Barrack defined the standard of care for orthopedic surgeons regarding the documentation needed to discharge a patient to a home health agency as simply to provide for the initiation of necessary care. He testified that there is no standard |sias to what format it must be in. Moreover, he explained that the vast majority of actions are taken through physician extenders — nurses and patient care coordinators — who convey discharge instructions to home health agencies. He testified that the discharge planning process is the standard of care for orthopedic surgeons in this case with respect to the discharge of patients with Hickman catheters. He pointed out that this type of discharge planning process is employed at most major medical centers, including Massachusetts General, Barnes Hospital, and all naval hospitals where he has practiced.
Dr. Barrack’s testimony regarding the discharge planning process is buttressed *747 by the testimony of both of the other orthopedic surgeons who testified at trial, Dr. Hanssen and Dr. Book. Dr. Book (who was a member of the MRP) testified that East Jefferson Hospital, where he practiced, had a similar discharge planning process. Likewise, Dr. Hanssen (who was Dr. Barrack’s expert) testified that the Mayo Clinic, where he practiced, had a similar protocol or pathway in place for discharge planning.
Dr. Hanssen further testified that he does not personally write orders for a Hickman catheter to be cleaned and maintained. The reason he does not do so, he explained, is because his hospital has a “systems process” under which “a variety of functions such as cleaning and maintaining I.V.’s are done by nurses and accomplished through nursing transfer orders when they’re given over to a home healthcare agency or going to another rehabilitation facility.” He further explained that under the systems process at his hospital those nurses would make sure that there is a continuity of patient care. Dr. Hanssen testified that “the nurses do all the transfer orders for the care of those Hickman catheters, so that I don’t write an | Reorder for every specific thing that happens. I think that’s pretty logical and common sense.”
Dr. Hanssen acknowledged that he saw no specific order from Dr. Barrack with respect to cleaning and maintaining the Hickman catheter after discharge; nonetheless, he testified that “I’ve done it zero times out of 371 [times that he has ordered the placement of Hickman catheters]. I have not written an order like that.” He further testified that he “wouldn’t expect to see an order from Dr. Barrack about that, unless he was in the habit of doing that, but I would think so.”
Although Dr. Hanssen acknowledged that the Hickman catheter was not expressly mentioned on the 2/10/02 Transfer Order Form, he testified that there potentially was something about the Hickman catheter elsewhere in the medical record. He pointed out that the bottom of the 2/10/02 Transfer Order Form cross-references (links) three other sources in the medical record (Part 1 — Referral, Part 2— Chart, and Part 3 — Social Services). Explaining the way the form worked, he testified that it links together other parts of the medical record. When asked where he would expect to find the order for the Hickman catheter care coming from this form, Dr. Hanssen testified that the most common area where he would look to find such information would be in the social services notes. He explained that “whenever a patient goes to a home healthcare agency, there are conversations between social service and nurse about all the requirements that are going to occur.” He acknowledged the lack of any documentation for that, but he testified that he “would assume that that’s what happened ... [because] that is how the process works.” The link on the bottom of the form, he explained, represents the conversation that he mentioned between the nursing staff and the home health agency about how to maintain and care for the Hickman catheter.
lasSummarizing, we find the cumulative direct and circumstantial[32] evidence in the record, which was tied togeth *748 er by Dr. Barrack’s testimony, establishes that Dr. Barrack did not breach the standard of care. Despite the lack of a specific, signed order for the continuation of care of the Hickman catheter upon discharge, the evidence establishes, that Dr. Barrack provided for the continuity of care for the Hickman catheter by implementing the TUHC discharge planning process. Therefore, the jury’s finding that Dr. Barrack did not breach the standard of care is not manifestly erroneous. See Landeche v. McSwain, 96-0959, p. 10 (La.App. 4 Cir. 2/5/97), 688 So.2d 1303, 1309.

The Posir-Trial Motions

Mr. Serpas’ other assignment of error is that the trial court erred in denying the Post-Trial Motions. Given the alleged lack of evidence to support the trial court’s initial ruling coupled with the Louisiana statutory law precluding Dr. Barack’s defense based on the home health agency providing the service, Mr. Serpas contends that the trial court erred in denying the Posh-Trial Motions. As to the motion for new trial, he cites the provision in La. C.C.P. art.1972 that a motion for new trial shall be granted “when the verdict or judgment appears clearly contrary to the law and evidence.” He contends that such is the case here. He points out that under the law — the Louisiana statutes regulating home health agencies — any order for the care of the Hickman catheter had to be issued and signed by Dr. Barrack. Since no such order exists, he contends that, as a matter of |34law, any verdict premised upon an order for a home health agency to care for the Hickman catheter cannot be maintained.
Citing Guillory v. Lee, 09-75, p. 38 (La.6/26/09), 16 So.3d 1104, 1131, Mr. Ser-pas points out that the test to determine whether a jury’s verdict should be set aside is whether it is supportable by a fair interpretation of the evidence. He contends that implicit in the jury’s verdict is a finding that Dr. Barrack gave an appropriate order for the continuity of care for the Hickman catheter after discharge; however, he contends that no such order was ever issued. It follows, he contends, that the jury’s verdict is not supported by a fair interpretation of the evidence.
Dr. Barrack counters that the jury understood TUHC’s orthopedic discharge planning process, which was triggered by Dr. Heilig’s order (written under Dr. Barrack’s supervision) for the Consult. As a result of that process, Dr. Barrack’s discharge instructions, including the continuity of care for the Hickman catheter, were accomplished. Dr. Barrack points out that Mr. Serpas’ attempt to assign fault to him based on Louisiana statutes — which are inapplicable to a Mississippi home health agency and which are not the standard of care for an orthopedic surgeon — was correctly rejected by the trial court.
Rejecting the same arguments that Mr. Serpas raises on appeal regarding the Post-Trial Motions, the trial court, in its reasons for denying the motions, stated as follows:
There was credible evidence adduced to support the jury’s finding that Dr. Barrack met the applicable standard of care for orthopedists based upon his practice, procedures and expectations when discharging patients with catheters in place, including the expectation of catheter maintenance when home health care was ordered through his Orthopedic Care Co-Ordinator, Shelby Hopkins, as documented in his post-op Physician Orders.
|asLa. R.S. 40:2116.34(A)(1) requires all “home health agencies to admit patients for skilled care only on the order of a physician.” The statute further prohibits home health agencies from uni *749 laterally admitting patients to its services without “signed physician orders.” While this court may disagree with the jury’s verdict, this is not a basis for usurping the jury’s role. The statute governs the mechanism by which a patient may be admitted for home health care for outpatient treatment for which there is no genuine issue of dispute in this case.
⅜ ⅜ ⅜ ⅜ ⅜ ⅜:
This is a case in which there was a dispute among the experts as to whether the defendant breached the applicable standard of care and where one of the former panel members switched his opinion regarding same. “It is the duty of the jury to evaluate the credibility of each witness, and come to conclusions as to the facts based on these evaluations.” In the instant case, it appears that the jury accepted the evidence put forth by Dr. Barrack and favored the testimony of Dr. Book in reaching its conclusion that there was no breach of the standard of care by Dr. Barrack. The jury’s verdict represents a fair interpretation of the evidence and, accordingly, the plaintiffs Motion for New Trial and/or for JNOV is denied.
We find no error in the trial court’s denial of the Post-Trial Motions. “A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict.” Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4 (La.11/28/00), 774 So.2d 84, 89. Such is not the case here. “A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence.” Davis, supra. We find, as did the trial court, that the jury’s verdict is supportable by a fair interpretation of the evidence. Thus, Mr. Serpas’ contention that the trial court erred in denying the Post-Trial Motions is unpersuasive.

lasDECREE

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. A Hickman catheter is an in-dwelling catheter that generally must be implanted and removed by a surgeon. An in-dwelling catheter is defined as a "catheter left in place for a period of time after its introduction.” P.H. Collin, DICTIONARY OF MEDICINE (3d ed.2000).

. Dr. Barrack's employer was Tulane Medical School, which was a separate entity from TUHC.

. As Dr. Barrack explained, the spacer served a two-fold purpose: (i) keeping the bones from fusing together, and (ii) providing a form of intravenous antibiotics. Dr. Barrack explained that the cement spacer functioned as an antibiotic for only about four weeks.

. The subclavian area is the area on the left side of the chest right below the collarbone.

. As part of the instructions to the home health nurse to administer the intravenous antibiotics, it was understood that the nurse would also inspect, care for, and maintain the Hickman catheter in accord with the home health agency's protocol.

. According to Dr. Barrack, Mr. Serpas had five weeks and two or three days of antibiotic treatment between the two surgeries.

. As Dr. Arlen Hanssen testified, the care of a Hickman catheter is very simple; however, a lay person must be instructed on how to do it. He explained that the dressing must be changed .and that the catheter must be flushed with a solution, usually heparin, to avoid clotting off in the bloodstream.

. Dr. Barrack testified that he routinely received. calls from home health agencies for clarification and that he was not difficult to reach. During the pertinent time period, he testified that he had a cell phone and that TUHC had a call center with a call tree. If he could not be reached, there was a resident, a fellow, and an orthopedic care coordinator who could be reached. For these reasons, he testified that it was "inconceivable to [him] that they would not be able to reach somebody with any kind of reasonable effort.”

.Mr. Serpas' expert, Richard MacMillan — an attorney and a nurse — testified that he requested the DHH's medical records for Mr. Serpas for the period from February 10 to 16, 2002; he was told that none existed. The start date of care in the DHH’s records that were provided was February 26, 2002. Mr. MacMillan agreed that if, as Mr. Serpas represented, the home health nurse did not perform any services at the patient’s house, there *733 would not be any charge for the visit. However, he testified that there would be documentation that the nurse went to the house and observed the catheter. Moreover, the ordinary procedure was for the first home health nurse visit to be an "evaluation and assessment of the patient;” and the home health agency would have charged for the assessment visit, which is not a treatment visit. Also, an actual plan of care would have been prepared following the assessment visit. DHH’s records reflect that its initial visit to Mr. Serpas' house was not until February 26, 2002. The agency's plan of care that was introduced at trial likewise documented that the agency's initial visit was on that date.

. Mr. Serpas represented at trial that he had the surgical staples removed on February 15, 2002, at Dr. Barrack’s office (clinic); however, the record is devoid of any evidence that the staples were removed at Dr. Barrack’s office on that date.

. The gold standard for determining whether the Hickman catheter was the source of the sepsis was to cut the tip of the catheter and test it; this test was not done at SMH. Thus, it could not be definitely proven that the Hickman catheter caused the infection.

.Whether any attempt was made to contact Dr. Barrack during the February 2002 SMH hospital stay was disputed at trial. Although Mr. Serpas’ sister, Patricia Boe, testified that she heard the treating physician in the emergency room say that they had unsuccessfully attempted to reach Dr. Barrack, Dr. Barrack denied receiving any such call. Ms. Boe also testified that during the hospital stay, Dr. Hall would periodically say that they were still trying to contact Dr. Barrack but that they could not reach him. Dr. Hall, however, did not testify to that effect. Rather, Dr. Hall testified that he attempted to reach Dr. Barrack on March 20, 2002, which was after Mr. Serpas was discharged. Again, Dr. Barrack denied receiving any call from Dr. Hall. Moreover, as noted elsewhere in this opinion, Dr. Barrack testified that he was not difficult to reach.

. The MRP found that there was no' deviation from the applicable standard of care by TUHC or its employees.

. Mr. Serpas subsequently filed an amended petition naming TUHC. TUHC's exception of prescription was granted; and TUHC was therefore dismissed from the suit. Thus, the sole defendant at the time of trial was Dr. Barrack. Mr. Serpas' amended petition also added as a party plaintiff his wife, Ruth Ser-pas. For ease of discussion, we refer to the plaintiffs in this case singularly as "Mr. Ser-pas.”

. The first jury interrogatory asked whether the jury "find[s] by a preponderance of the evidence that defendant, Dr. Robert Barrack, breached the applicable standard of care in his treatment of plaintiff, Arthur Serpas, Jr.”

. See Gonzalez v. El Paso Hosp. Dist., 940 S.W.2d 793, 797 (Tex.App.-El Paso 1997) (noting that "[t]he jury heard evidence that a pseudomonas infection arising from use of a Hickman catheter is unlikely and rare.”)

. As noted elsewhere, Dr. Book, an orthopedic surgeon member of the MRP, also testified that the handwritten note by the discharge nurse, dated February 10, 2002 (the "Discharge Nurse's Note”) was evidence that Dr. Barrack had a reason for leaving the Hickman catheter in place.

. If intravenous antibiotics had been ordered, such an order would have been unnecessary because an order to the home health *741 agency to administer intravenous antibiotics would have included, as part of the administration of antibiotics, that the agency apply its protocol of maintaining and cleaning the Hickman catheter. Such was the case when Mr. Serpas was discharged on January 7, 2002, following the first part of the surgical procedure.

. The other panel member, Dr. Kitziger, an orthopedic surgeon, did not testify at trial. Although Dr. Kitziger’s video deposition was taken for introduction at trial, neither party introduced it into evidence.

. Neither the discharge nurse, nor a representative of the home health agency, DHH, was called as a witness at trial.

. Dr. Coco acknowledged that he saw no documentation that a home health nurse visited Mr. Serpas' house between February 10 and 16, 2002.

.When asked at trial whether he found that Dr. Barrack’s actions or inactions were below the standard of care, Dr. Book's response was "[a]t the time of the panel meeting, we did.” At trial, however, Dr. Book retracted his opinion and testified that Dr. Barrack did not breach the standard of care.

. Mr. MacMillan explained that the home health agency must first be satisfied that the nurse giving an oral order is affiliated with the treating physician.

. Contrary to Mr. Serpas' suggestion, Dr. Barrack's position is not that the Discharge Nurses’ Note was a physician order; rather, his position is that the required physician’s order was issued on February 6, 2002, by Dr. Michael Heilig, a resident acting under his supervision; this order triggered TUHC’s discharge planning protocol. Dr. Barrack contends that this obviated the need for any additional order.

. Dr. Barrack pointed out another reason for the discharge planning process is that hospitals do not want physicians involved in the process of referring or selecting home health agencies due to the potential conflict of interest.

. An orthopedic care coordinator — also called a case manager — has special training in interfacing with home health agencies. The orthopedic care coordinator’s role includes assessing the patient’s health insurance benefits; collaborating with the patient, the patient’s family, and the case management team to coordinate the discharge plan; and arranging for all of the patient's needs when they are discharged. TUHC had about four orthopedic care coordinators on staff; Shelby Hopkins was the one generally assigned to Dr. Barrack's patients.

. The record reflects that while Mr. Serpas was in the recovery room following surgery, Dr. Heilig signed "Physician’s Orders,” which included requests for the following three consults: (i) Orthopedic Care Coordinator . for Discharge Planning; (ii) Physical Therapy.for Post-op THA Protocol; and (iii) Occupational Therapy for ADL’s [Activities of Daily Living] and assistance devices.

. Dr. Barrack explained that the significance of the physician’s order requesting the Consult was that ”[t]his is directing an orthopedic care coordinator to be assigned to the case, for them to either make rounds with us the next day or for us to meet with them after rounds to clearly indicate what the plan is for the patient, so that they could meet with the patient and the family and, again, start the process of arranging for all that they would need for their discharge, determine that would be to a facility or to home, and what they will need to have ready for them when the arrive at that facility or at home.”

. Mr. Serpas’ position is that no such order regarding the Hickman catheter was ever issued by Dr. Barrack.

. Given the discharge plan, Dr. Barrack explained that, at the time of Mr. Serpas’ discharge, the only duty left for the home health agency to perform was to maintain the Hickman catheter. The Discharge Nurse’s Note indicated to him that "the home health agency is to clean and care for the catheter because the patient is taking care of his knee wound [daily] and he's going to physical therapy at Slidell Memorial. So, there’s nothing else for the home health agency to do.”

. Dr. Barrack testified that although his attorney attempted to obtain the records of this particular home health agency, DHH, his attorney was unable to do so. For this reason, he explained that there is no record of the faxes that were sent on February 7 and 10, 2002. He also noted that the reason the faxes are not in the hospital record is because home healthcare is an ancillary service. Finally, he pointed out that at the time this occurred.— February 2002 — faxes were still being used regularly as a means of communication.

. Circumstantial evidence is "evidence of facts or circumstances from which one might infer, using reason and common experience, the existence of other connected facts.” Holloway v. State ex rel. Bd. of Sup'rs of LSU, 10-1754, p. 10 (La.App. 4 Cir. 5/25/11), 66 So.3d 1222, 1227 (citing Joseph v. Broussard Rice Mill, 00-0628, p. 8 (La.10/30/00), 772 So.2d 94, 100-01). "Circumstantial evidence may be as persuasive as testimonial or direct evidence in demonstrating the existence or nonexistence of a fact issue.” Holloway, supra.